Allen, J.
 

 Courts of Oyer and Terminer are recognized by the Constitution of 1821 and 1846, but by neither are they constituted or organized, or their jurisdiction and powers declared. The Constitution of 1821 provided for the appointment of a clerk of that court, in and for the city and county of Hew York, and declared that circuit judges should be appointed, who should possess the powers of a justice of the Supreme Court in courts of Oyer and Terminer and general jail delivery. (Const., act 4, § 13; act 5, § 5.) The Constitution of 1846 declares that any one of the justices of the Supreme Court “ may preside in courts of Oyer and Terminer in any county.” (Const., act 6, § 6.) The same provision is made a part of section 7 of the same article as amended in 1869.
 

 This provision is in accord with previous legislation, and makes the presence of a justice of the Supreme Court indispensable to the proper organization of a court of Oyer and
 
 *333
 
 Terminer. Before the adoption of that Constitution a court of Oyer and Terminer, whether held under a special commission or under the general statutes, could not be held for the trial of indictments without the presence of a justice of the Supreme Court or a circuit judge. (2 B. S., 204, §§ 28, 32.) For certain purposes a circuit judge could hold a court of Oyer and Terminer without the presence of associates. (2 B'. S., 748, § 41.)
 

 Prior to 1846 the constitution of courts of Oyer and Terminer in respect to the judges thereof, as well as the extent of their powers and jurisdiction, and the mode and manner of the exercise of those powers, was controlled by legislation, and the courts were differently organized and constituted at different periods of time, and in different localities.
 
 (People
 
 v.
 
 White,
 
 22 W. R., 167; 24 id., 518.) In the city of New York, under the colonial governments, criminal jurisdiction was exercised by the mayor, recorder and aldermen, who were “justices assigned of Oyer and Terminer and of the jail delivery of all and every jail” in the said city and county. (Montgomery charter, § 26.)
 

 In 1798 a court of Oyer and Terminer was established by act of the legislature for that city and county, and from that time to this the legislature has prescribed sometimes in the general statutes and sometimes by special acts, or by provisions in acts amending the charter of the city, the constitution and organization of those courts, and the organization has differed in some respect from that of the same court in other parts of the State. With the single exception that a justice of the Supreme Court must be a member of, and preside in the court, the whole subject of the organization of the court is still with the legislature. The legislature may associate other judicial officers with the presiding justice or provide for commissioners to sit with him, or allow him to preside without assistants or associates, making him the sole judge of the court. Stress is laid upon the particular language of the clause of the Constitution defining the powers of a justice of the Supreme Court, the claim being
 
 *334
 
 that it indicates an intent to forbid the holding of a Court of Oyer and Terminer by a justice of the Supreme Court without associate judges. But, if such had been the intent of the framers of that instrument, they would have so said in terms, and declared of what judges the court should consist, and what number should constitute a quorum, as they have in respect to other courts. It is plain, however, from the reading of the clause, that it was not intended absolutely to require associates to act with the presiding justice in holding Courts of Oyer and Terminer; but that the legislature was left free to change the constitution of the courts as should be deemed expedient, with the single limitation of the power imposed by the requirement that a justice of the Supreme Court should preside. The language chosen was apt. Special- Terms and Circuits were held by a single judge, and Courts of Oyer and Terminer consisted, as then organized, of several judges, a justice of the Supreme Court or circuit judge being one, and presiding; and, hence, as it was not intended to compel a change in the organization, it was merely enacted that a justice of the Supreme Court should “ preside ” in them, and the language was in accommodation to the existing state of things, and the word “preside,” instead of
 
 “
 
 hold,” was used.
 

 A judge may “preside,” whether sitting as a sole judge, or as one of several judges.
 

 The chancellor “presided” in the Court of Chancery, although he was the sole judge of that court, and in the same sense in which the chief judge of this court “presides.”
 

 When a judge “holds” a court, he directs, controls and governs it, as the chief officer; and this is the extent of the meaning, of the word “preside.” The presiding judge of a court consisting of several members, or of a court of which he is the sole judge, as of a Court of Oyer and Terminer, with its grand and petit jury, its attendant sheriffs, clerks and other officers, does this, and nothing else, under the name of “ holding ” or “ presiding in ” the court.
 

 The particular- phraseology was made necessary by the then actual organization of the different courts named; but a jus
 
 *335
 
 tice of the Supreme Court does, within the meaning of the Constitution, “ preside,” when by authority of the legislature, he “holds” a Court of Oyer and Terminer as the sole judge thereof.
 

 A more serious question grows out of the legislation upon the subject. By chapter 280 of the Laws of 1847, section 39 (S. L., 330), it was enacted that Courts of Oyer and Terminer of the county of New York should be composed of a justice of the Supreme Court, and any two of the officers named, to wit, the judges of the Court of Common Pleas of the city and county, or the mayor, recorder, and aldermen of the city. By section 5 of chapter 217 of Laws of 1853, entitled “ An act further to amend the charter of the city of New York,” it was declared that no alderman should thereafter sit or act as a judge in the Court of Oyer and Terminer or in Courts of General or Special Sessions of the Peace; and by an act supplementary to that act, chapter 352 of the Laws of the same year, section 3, it was enacted that “ hereafter Courts of Oyer and Terminer in and for said city may be held by a justice of the Supreme Court; and Courts of General Sessions of the Peace, in and for the said city, by the recorder or city judge, and that when either of the said courts shall be so held by a single judge, all the power and jurisdiction appertaining by law to such court should he exercised by such judge. By chapter 446 of the Laws of 1857, the charter of the city of New York was amended, and the acts of 1853 were superseded and in terms, repealed; but by section 90 of the act (S. L., p. 890), the provisions of these acts relating to the Courts of Oyer and Terminer, and the Courts of General and Special Sessions in the city and county of New York, were re-enacted in the words of the former statutes. By the acts of 1853, continued by the acts of 1857, the criminal courts were reconstructed and their organization essentially changed, and so much of the act of 1847 as related to the organization of the Court of Oyer and Terminer, and other acts relating to the Courts of General Sessions, were superseded
 
 and,pro tanto,
 
 repealed. The same policy dictated the
 
 *336
 
 change in each court, and was carried into effect by a single provision. From 1853 to the present time, the courts named have been held, each by a single judge.
 

 ' The organization of these courts, and especially that of the court of Oyer and Terminer is now challenged, on the ground that the acts of 1853 and 1857, and all parts of them, were absolutely repealed by chapter 137 of the Laws of 1870, entitled “ An act to reorganize the local government of the city of ¡New York.” By section 120 of that act (S. L., p. 396) the three acts were well and accurately described by their titles, and the dates of their passage, and with other acts relating to the government of the city of ¡New York, and declared to be “hereby repealed.” As there is no qualification, or limitation annexed to the repealing clause, it is conceded that it is sufficient in terms to accomplish all that is claimed for it, and literally interpreted, effectually abrogates the laws of 1853 and 1857, reorganizing the criminal courts in the city of ¡New York. The effect of the repeal of these provisions would be to revive the law of 1847, so far as the Court of Oyer and Terminer is concerned, and prior acts by which the Court of General Sessions was organized, and place both courts on the footing which they had prior to the passage of the act of 1853. In that event, neither court could be held by a single judge. The practical effect of a judgment giving full and literal effect to the repealing clause in the act of 1870, would be to annul all the proceedings in, and judgments of both courts for the last two years, and the consequences would seriously affect the public as well as individuals. A statute should not be so construed as to work a public mischief, unless required by words of the most explicit and unequivocal import.
 
 (People
 
 v. Lambier, 5 Denio, 9.)
 

 In the construction of statutes, effect must be given to the intent of the legislature whenever it can be discerned, though such construction seem contrary to the letter of the statute. That intent must be primarily sought in the language of the statute, and if the words employed have a well understood meaning, are of themselves precise and unambiguous, in most
 
 *337
 
 cases no more can be necessary than to expound them in their natural and ordinary sense. The words in such case ordinarily, best declare the intention of the legislature.
 
 (Sussex
 
 v. Peerage, 11 C. & F., 86;
 
 Newell
 
 v. People, 3 Seld., 97;
 
 McCluskey
 
 v. Cromwell, 1 Kern., 593.) These rules are elementary, but it is equally well settled that words, absolute of themselves, and language the most broad and comprehensive, may be qualified and restricted by reference to other parts of the same statute in which they are used, and to the circumstances and facts existing at the time, and to which they relate, or are applied. A literal interpretation of words in most common use, and having a well defined meaning as ordinarily used, would not unfrequently defeat rather than accomplish the intent of the party using them. If in reading a statute in connection with other statutes passed at, or about the same time, a doubt exists as to the force and effect the legislature intended to give to particular terms, that is as to the meaning which it was intended they should bear and have in the connection in which they are used, it is also competent to refer to the cir- ¡ cumstances under which, and the purposes for which a statute is passed, to ascertain the intent of the legislature. The ground and cause of the making of a statute explains the intent. (Com. Dig. Parliament K., 11.)
 

 The title of the act is local, relating solely to the political organization of the city. It does not indicate an intent to reconstruct or interfere with the organization of the criminal courts of the city, and the act in all its provisions, strictly adheres to the title. It reorganizes the legislative, executive and administrative departments of the city and county. So far as the city government proper is concerned, it provides a substitute for all the statutes in terms repealed by it, but not for the provisions embodied in the same acts, and particularly that of 1857, affecting the courts of Oyer and Terminer and General Sessions. It is known from the history of the law and the circumstances under which it was enacted as well as from its terms, that the chief end and object was to secure a new
 
 *338
 
 and amended charter for the city. There was no reason for, or movement in favor of, restoring judicial functions to aldermen, or taking judges of the Common Pleas from their own courts, and placing them by the side of a justice of the Supreme Court, in the courts of Oyer and Terminer. The indications thus far of an intent on the part of the legislature to qualify and limit the effect of the repealing clause in the act of 1870, and retain the provisions of the acts, especially named therein, under which the criminal courts of the city were then organized, may be slight; but it is sufficient to create a reasonable doubt, and justify the looking outside of the act for other legitimate evidences of the intent. The constitution of the courts named has been regarded as preserved, and continued under the acts of 1853 and 1857, notwithstanding the acts of 1870, by the courts in question, by the profession and the public, and they have exercised unquestioned jurisdiction from that time to this, and their proceedings and judgments have been affirmed in this court without question as to their righful organization.
 

 The question whether a repeal of a prior statute, absolute in terms, can be limited' in its operation and effect for any reason has frequently arisen; and the decisions of the courts have been uniform, that while the language of the repealing clause must be accepted as the expression of the will of the legislature, and effect given to it according to its terms, unless it appears although the language of the appeal was general and unqualified that it was intended to be used in a qualified or limited sense; that whenever that intent is discovered effect must be given to it, as in the interpretation of other acts.
 
 (King
 
 v. Rogers, 10 East, 566;
 
 Warren
 
 v.
 
 Windle,
 
 3 East, 205.)
 

 If the repeal of a statute is by express and positive terms, and there is no legitimate evidence in or out of the act of an intent to qualify and restrict the operation, that is, no limitation or qualification, express or implied, the only question is as to the effect of the repeal, and the rule is that for all purposes the law repealed is as if it had never existed.
 
 (Miller’s case,
 
 1 W. Bl. R., 451;
 
 Butler
 
 v. Palmer, 1 Hill,
 
 *339
 

 324; Maggs
 
 v.
 
 Hunt,
 
 4 Bing., 212;
 
 Surtees
 
 v.
 
 Ellison,
 
 9 B. & C., 750.) A clause in a statute purporting to repeal other statutes is subject to the same rules of interpretation as other enactments, and the intent must prevail over literal interpretation. One part of an act of the legislature may be referred to in aid of the interpretation of other parts of the same act. So in ease of doubt or uncertainty, acts
 
 in pari materia,
 
 passed before or after, and whether repealed or unrepealed, may be referred to in order to discern the intent of the legislature in the use of particular terms; and within the same rule, and the reason of it, cotcmporaneous legislation, although not precisely in
 
 pari materia,
 
 may be referred to for the same purpose. Statutes
 
 in. pari materia
 
 relate to the same subject, the same person or thing, or the same class of persons or things, and are to be read together, for the reason that it is to be implied that a code of statutes relating to one subject is governed by the same spirit, and are intended to be harmonious and consistent. They are to be taken together as if they were one in law, as one statute. (1 Kent Com., 463;
 
 Church
 
 v.
 
 Crocker,
 
 3 Mass., 21;
 
 Mendon
 
 v.
 
 Worcester County,
 
 10 Pick., 235;
 
 United Society
 
 v.
 
 Eagle Bank,
 
 7 Conn., 456; Bacon’s Abdg’t Stat. J., 3;
 
 McMillan
 
 v.
 
 Adams,
 
 1 Macq. H. L. Cas., 120;
 
 Rogers v. Bradshaw,
 
 20 J. R., 735 ;
 
 McCartee v. Orphan Asylum,
 
 9 Cow., 437.)
 

 Statutes enacted at the same session of the legislature should receive a construction, if possible, which will give effect to each. They are within the reason of the rule governing the construction of statutes in
 
 pari materia.
 
 Each is supposed to speak the mind of the same legislature, and the words used in each should be qualified and restricted, if necessary, in their construction and effect, so as to give validity and effect to every other act passed at the same session.
 
 (State v. Stocking,
 
 2 Black. B., 249.) But for the acts of 1853 and 1857 the court of General Sessions could not have been held by the recorder or city judge alone; and if these acts were repealed in April, 1870, as claimed, that court could only have been held by the mayor, recorder, city judge, or
 
 *340
 
 judges of the Common Pleas, and aldermen, or any three of them, of whom the mayor, recorder, city judge, or one of the judges of the Common Pleas should be one, as by the repeal the former statutes prescribing the organization of the court would have been revived. (2 E. L., 506, § 8; Laws of 1821, p. 65.) If the part of the law of 1853 and 1857 permitting the courts of Oyer and Terminer to be held by a justice of the Supreme Court was repealed, it follows that the authority of the recorder and city judge to hold the Court of Sessions alone was abrogated, for they were both provided for in the same section, ánd were parts of the same enactment in the statutes now claimed to have been repealed, and as neither were excepted or referred to in the act of April, 1870, or in any way distinguished from the other, the repealing clause in the latter act was operative or inoperative as to both courts. The provision as to both courts constituted one system for the organization of the criminal courts of the city of New York. The same legislature that passed the act of April, 1870, also passed a law in May of the same year, less than a month after the passage of the first act (Laws of 1870, chap. 554), clearly recognizing the authority of a single judge to hold the Court of Sessions alone, and to the exclusion of the judges of the Common Pleas, and all others, which authority did not exist, if the acts of 1853 and 1857 had been unqualifiedly and in all their parts repealed by the act of April preceding. The legislature impliedly affirmed the continuing validity and force of the statutes of 1853 and 1857, relating to the organization of the criminal courts of New York by providing substitutes for the recorder and city judge from the bench of the Common Pleas, and authorizing the judges of the latter court to “ hold ” the court in place of the recorder or city judge when they should not attend. But if the recorder or city judge could not “ hold ” the court alone, or the judges of the Common Pleas could sit in that court, in pursuance of the statutes revived by the repeal of the statutes of 1853 and 1857, the act was a nullity, and the legislature did a vain thing which the law will not intend. The act in a sense is in
 
 *341
 

 pari materia
 
 with that of April preceding. The one act provided a substitute for the main provisions of the acts of 1853 and 1857, and the other legislated in respect to matters foreign to the others, but which were embodied in the same act, and as if the part of the act relating to those matters was still operative, and had not been repealed. The last act reflects light upon the first, and is a very significant indication that the legislature did not intend by the comprehensive terms of repeal to abrogate the organizing law of the criminal courts in Hew York, which had a place in the acts purporting in terms to be repealed, and did not suppose that the organization of these courts had been affected. Both acts can stand together by giving the repealing clause a qualified and restricted operation in harmony with the evident intent of the legislature, and not otherwise. In
 
 Rumsey
 
 v.
 
 People
 
 (19 N. Y., 41), an act passed in 1854, which in
 
 Lanning
 
 v.
 
 Carpenter
 
 (20 id., 447), was adjudged to have been unconstitutional at the time of its enactment, was sustained as valid from 1857, when it could have been constitutionally passed for the reason assigned by two of the five judges concurring in the judgment, that the law had been incidentally recognized as in force in several acts of the legislature in 1857.
 

 Here cotemperan eous legislative action and interpretation coincided with the practical construction of the act of 1870, which at this late day is claimed to have abrogated the right of one judge to hold a court of Oyer and Terminer in Hew York, and is adverse to the claim. This legislative action is legitimate evidence of the intent of the law makers to which courts may resort, and by which they are bound in the interpretation of statutes. While every reasonable doubt upon any question of law or fact bearing upon the guilt or innocence of the accused should be solved in his favor, doubts as to jurisdiction may, in a case like this, be solved in favor of the tribunal exercising it, unless by so doing some established rule of law will be palpably violated.
 

 Pabkek, B., in
 
 Miller
 
 v.
 
 Solomans
 
 (7 Exch. B., 546), says : “ It is, however, true that words which are plain enough in
 
 *342
 
 their ordinary sense may, when they would involve any absurdity or inconsistency, or repugnance to the clear intention of the legislature, to be collected from the whole of the act or acts
 
 m pa/ri materia
 
 to be construed with it, or other legitimate grounds of interpretation, be modified or altered so as to avoid that absurdity, inconsistency or repugnance, but no further, for then we may predicate that the words never could have been used by the framers of the law in such a sense.” The evidence from legitimate sources is conclusive that the legislature did not intend, by the repealing clause in the act of April, 1870, to affect the organization of the criminal courts in the city of New York. One ground claimed for the regularity of the court, as held by one judge, should be noticed, as it cannot be sustained and the discussion of it, without an adjudication by this court, might leave a doubt, and lead to litigation respecting the organization of the courts of Oyer and Terminer in counties other than New York. The Code of 1848 is relied upon as super-ceding
 
 pro tanto
 
 the act of 1847, and making provision for courts of Oyer and Terminer throughout the State. It is somewhat significant that such wAs not the cotemporaneous construction of the Code, and such effect has never been attributed to it. The acts of 1853 and 1857, changing the organization of the courts of Oyer and Terminer in New York city, were passed upon the theory that the act of 1847 was still in force, and the legislature has since made provision for supplying the places of those who were made judges of those courts in other counties by the act of 1847, but might not be in attendance at the opening of the court, or in case of vacancy in the office. (Laws of 1854, chap. 73; Laws of 1870, chap. 3.)
 

 The judiciary act of 1847 (S. L., p. 330, § 38), in the article providing for “ Criminal Courts,” enacts that courts of Oyer and Terminer shall be held at the same times and places that Circuit Courts of the same county shall be appointed to be held. In the article of the same act providing for the organization and holding of the Supreme Courts by section
 
 *343
 
 24 (S. L., p. 326), it was provided that a General Term of the Supreme Court should be held at the capítol, in the city of Albany, on the first Monday of July thereafter, and said court should at that time, by an order, arrange and appoint the General and Special Terms of said court, and the terms of all the Circuit Courts, and courts of Oyer and Terminer, and assign the business and duties to the justices thereof' respectively, and that a like term should be held iu January, 1850, and every second year thereafter, at which like order should be made and entered.
 

 This provision had no relation to the organization and composition of the several courts when held. That was provided for elsewhere, and by other acts. It did not contemplate a court of Oyer and Terminer to he held by the justice then assigned, without the presence of the other judges, made a part of the court by subsequent sections of the same act. It was simply a provision for the apportionment of the business among the several justices of the Supreme Court, and an assignment of the duties of each, and the designation of the time and place for holding the courts, which the law required should be held. What should constitute a court, and of what number of judges it should be composed, and what its jurisdiction when organized should be, was not provided for in that section. By section 17 of the Code, the provisions of that particular section of the judiciary act, and the order of the Supreme Court made pursuant thereto in July, 1847, were repealed and abrogated, and the provisions of the hill of which section 17 wras apart, substituted therefor. By that title the number of Special Terms, Circuit Courts, and courts of Oyer and Terminer in the several counties was prescribed, and the governor was required to designate the times and places of holding the several terms. Circuit Courts, and courts of Oyer and Terminer, and the judges by whom they should be held, up to December 31st, 18#9, after which time the Supreme Court were to exercise that power. It was no legislative power that was vested in the governor, affecting the constitution and organization of the several courts.
 
 *344
 
 He had simply the power to designate or assign particular justices of the Supreme Court to particular duties, to assign to each justice the courts which he should hold, or in which he should preside. Ho part of the act of 1841- was repealed in terms, other than that relating to the appointment of the terms of the courts, and the designation of the particular justices who were to hold or preside in them. Other provisions of the same title of the. Code affected other parts of the judiciary act; and so far as they were repugnant, or inconsistent with the judiciary, or any other existing act of the legislature, they operated
 
 fro tanto
 
 to repeal the prior provisions. But there are no provisions affecting the organization of the courts of Oyer and Terminer in the city and county of Hew York, or the other counties of the State; and the provisions of section 39 of the judiciary act, as it was not referred to or described in the repealing clause of the seventeenth section of the Code, and was not impaired or repealed by implication by any of the other provisions of the Code ; but by section 26 of the present Code (section 28 of the Code of 1848), justices of the Supreme Court are referred to as “ presiding ” in courts of Oyer and Terminer, which would have been inconsistent with the idea now put forth, that the governor was to assign him to
 
 hold
 
 the court.
 

 It would be giving an effect to the seventeenth section of the Code not warranted by its terms, and entirely beyond its scope and intent to construe it as a repeal of all the acts providing for the organization and composition of the courts of Oyer and Terminer, and vesting the power in the governor to declare of what, and what number of judges they should be composed.
 

 Ho other objection is taken to the conviction, other than that the Oyer and Terminer in which the indictment was found was not legally constituted, and as that objection is not well taken, and cannot be sustained, the judgment must be affirmed.
 

 All concur. Judgment affirmed.